UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| EVE BAKER SPARKS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | No. 2:20-cv-00601-JMS-MJD |
| | ) | |
| CHRISTINE WORMUTH, | ) | |
| | ) | |
| *Defendant*. | ) | |

## ORDER

*Pro se* Plaintiff Eve Baker Sparks is a woman who was born in 1966. In 2014, Ms. Sparks was hired by the United States Army to work as an Explosives Handler at the Crane Army Ammunition Activity ("CAAA"), which is located in the Naval Surface Warfare Center in Crane, Indiana ("the Base"). After her employment was terminated in 2017, Ms. Sparks filed this lawsuit alleging employment discrimination and retaliation based on her sex and age, among other things. Ms. Sparks has filed a Motion for Summary Judgment with Compensation, in which she seeks judgment in her favor on all of her claims. [Filing No. 41.] Christine Wormuth, Secretary of the Army, has filed a Cross-Motion for Summary Judgment, seeking judgment in her favor on all of Ms. Sparks' claims. [Filing No. 48.] In addition, Ms. Sparks has filed a "Motion to Remove a Filed Document by the Defendant and Document Should be Disregarded" ("Motion to Strike") [Filing No. 54], in which she asks the Court to strike a Notice of Supplemental Authority filed by Ms. Wormuth, [Filing No. 53]. All three of these motions are ripe for the Court's decision.

# I.
## MOTION TO STRIKE

After the cross-motions for summary judgment were briefed, Ms. Wormuth filed a Notice of Supplemental Authority, directing the Court's attention to the Seventh Circuit's recent decision in *Paschall v. Tube Processing Corp.*, 28 F.4th 805 (7th Cir. 2022), which Ms. Wormuth asserts "provides further support for several aspects of the government's motion for summary judgment in this case." [Filing No. 53.]

Ms. Sparks moved to strike the Notice of Supplemental authority, arguing that the filing "should be disregarded by the Court." [Filing No. 54 at 1.] Specifically, she asserts that Ms. Wormuth's "attempt to sway the Court with [her] filing of a recently decided case" is "outrageous," because the notice was filed after the deadlines for summary judgment briefing and submissions had passed. [Filing No. 54 at 1-2.] Ms. Sparks also argues that considering the 19-page *Paschall* decision along with Ms. Wormuth's 10-page reply brief would put Ms. Wormuth over the 20-page limit for her reply, with was set forth in the Court's previous Order establishing the summary judgment briefing schedule. [Filing No. 54 at 1-2.]

In response, Ms. Wormuth points out that *Paschall* was decided the day after her reply brief was due. [Filing No. 55 at 1.] She further argues that *Paschall* is binding precedent, and therefore any suggestion that the Court disregard it is meritless. [Filing No. 55 at 1.] In addition, Ms. Wormuth contends that her Notice of Supplemental Authority was less than one page long, and the fact that she submitted a copy of the *Paschall* decision as a courtesy along with the notice "does not render [her] filings overlong." [Filing No. 55 at 1.]

The Court can and must always consider binding precedent when rendering a decision. And in ruling on any given motion, the Court will likely consider many cases decided by the Seventh Circuit (and potentially by other courts), but the length of these decisions will never

count toward any party's page limit for briefing, even where a party specifically directs the Court's attention to the decision.  There is nothing "outrageous" about Ms. Wormuth filing her Notice of Supplemental Authority, and although the Court is perfectly capable of locating and applying all binding precedent on its own, the Court acknowledges that Ms. Wormuth was attempting to assist the Court.  Ms. Sparks' Motion to Strike, [Filing No. 54], is **DENIED**.  The Notice of Supplemental Authority, [Filing No. 53], shall remain on the docket, and the Court will consider the *Paschall* decision to the extent that it is relevant to the Court's ruling on the merits of the cross-motions for summary judgment.

## II.
### SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary

judgment because those tasks are left to the factfinder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."  *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact."  *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on

which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id*. at 648.

### III.
### STATEMENT OF FACTS

At the outset, the Court notes that Ms. Sparks both failed to support many of the factual assertions in her briefs with citations to evidence in the record and failed to properly dispute many of Ms. Wormuth's factual assertions.  As noted above, the Court may disregard factual assertions that are not properly supported, and may accept as true facts that are not properly disputed by the opposing party.  Nevertheless, in light of Ms. Sparks' *pro se* status, the Court has done its best to evaluate the evidence in the record and determine which facts are disputed based on admissible evidence for purposes of deciding the summary judgment motions.  Furthermore, some of Ms. Sparks' allegations—though unsupported by evidence—are included in the Statement of Facts to provide context for understanding the basis of her claims.  But when those unsupported allegations bear on the outcome of the case, the Court will so note, and not consider them in deciding the instant motions.

With the foregoing clarification in mind, the following factual background is set forth pursuant to the standard discussed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence—as supported by the record—are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  Ms. Sparks' Employment

Ms. Sparks was hired by the Army as a Wage Grade 5 Explosives Handler at CAAA in February 2014.  [Filing No. 48-1 at 38.]  Her job involved manufacturing and demilitarizing or disassembling explosives and other sorts of ammunition.  [Filing No. 48-1 at 45-48.]  Mickey Wager was Ms. Sparks' immediate supervisor.  [Filing No. 48-1 at 51.]  Lance Daters, the Production Line Manager, was the supervisor one level above Mr. Wager.  [Filing No. 48-1 at 77-78; Filing No. 42-1 at 3.]

Ms. Sparks held the Explosive Handler position for the duration of her employment at CAAA, at first on an intermittent basis and then on a term basis.  [Filing No. 48-1 at 62.]  Specifically, in February of 2015, Ms. Sparks signed a contract for a term of employment that was "limited to one year and one day and [was] subject to termination at any time."  [Filing No. 48-3 at 1.]  Her contract further specified that "[i]f [her] appointment [was] extended beyond one year and one day," she "may not work more than a total of four years."  [Filing No. 48-3 at 1; *see also* Filing No. 48-1 at 64-65 (Ms. Sparks testifying that she was "serving for a period of one to four years" and that her term was "renewed or not renewed each year").]

### B.  Ms. Sparks' Allegations of Harassment and Assault Against Theron Wright

Ms. Sparks met Theron Wright ("Theron"), another CAAA employee, while she was working at the ammunition burning grounds.  [Filing No. 48-1 at 74.]  Ms. Sparks and Theron were both married to other people at the time.  [Filing No. 48-1 at 82.]  Theron was a Wage Grade 7 Munitions Destroyer.  [Filing No. 48-1 at 74.]  The job of a Munitions Destroyer involves demolishing explosive devices by detonating them.  [Filing No. 48-1 at 59.]  Theron also reported directly to Mr. Wager.  Theron did not have any supervisory authority over Ms. Sparks.  [Filing No. 48-1 at 71; Filing No. 48-1 at 79-80.]

6

Ms. Sparks alleges that Theron began sexually harassing her in July of 2015.  [Filing No. 41-9 at 2; Filing No. 48-1 at 71-72.]  Specifically, she alleges that "[h]e would make comments about [her] breasts and [her] body and he would grab [her] private areas during work hours." [Filing No. 48-1 at 81.]  She also alleges that he was "constant[ly] checking out [her] butt and telling [her] what color bikini panties [she had] on that day."  [Filing No. 41-9 at 2.]  According to Ms. Sparks, the harassment "escalated to [Theron] groping [her] breasts outside and inside [her] shirt" and "shoving his hand down [her] coveralls to grope [her] private area outside of [her] bikinis" and then "inside [her] bikinis."  [Filing No. 41-9 at 2.]

Ms. Sparks alleges that on August 4, 2015, she and Theron were riding in a truck together when he "placed [her] hand on his penis on the outside of his pants" and asked her to perform oral sex on him.  [Filing No. 41-9 at 3.]  According to Ms. Sparks, she complied with this request because she thought that if she did not, Theron "would tell [Mr. Wager] about what had been going on and make it [her] fault then [she] would lose [her] job[.]"  [Filing No. 41-9 at 3.]

Ms. Sparks further alleges that on August 6, 2015, Theron asked her to drive him "down the Jeep Trail" near the ammunition burning grounds and he "proceeded to put his hands down [her] pants and try and pleasure [her]."  [Filing No. 41-9 at 3.]  She states that she resisted, and Theron asked her to step out of the truck and the two walked to the back of the truck.  [Filing No. 41-9 at 3.]  According to Ms. Sparks, Theron put the tailgate down, "then proceeded to pull [her] coveralls and bikinis down, back [her] up against the truck on to the tailgate," and "have intercourse with [her]" without her consent.  [Filing No. 41-9 at 3; Filing No. 48-1 at 94.]

Ms. Sparks testified that there were no witnesses to any of these incidents.  [Filing No. 48-1 at 84.]  She stated that she did not report Theron's actions to Mr. Wager, because she believed that Mr. Wager had previously been the subject of a sexual harassment complaint by

another employee, Amy Wagler, and as a result he "tr[ied] to dissuade employees from making statements that might lead to [Equal Employment Opportunity ("EEO")] complaints." [Filing No. 48-1 at 85-87.] Ms. Sparks has no direct knowledge of the situation between Mr. Wager and Ms. Wagler, but believes based on secondhand information from other sources that the two had a six-year affair and after Ms. Wagler reported it, her employment at CAAA ended. [Filing No. 48-1 at 86-87.] As a result, Ms. Sparks "assumed at the time that if [she] reported [the alleged harassment by Theron], [she] would not have a job anymore." [Filing No. 48-1 at 86-87.]

### C. Ms. Sparks Begins a Consensual Relationship with Theron Wright

In September of 2015, Ms. Sparks voluntarily entered into a consensual sexual relationship with Theron. [Filing No. 48-1 at 99-100.] After the consensual relationship began, Ms. Sparks and Theron would meet outside of work for sexual encounters, but she maintains that they never engaged in any sexual activity at work. [Filing No. 48-1 at 100.] Ms. Sparks testified that Theron never touched her or made any harassing comments to her at work after September 2015. [Filing No. 48-1 at 100-01.]

### D. Workplace Rumors Regarding Ms. Sparks

Ms. Sparks alleges that a number of rumors about her circulated around the Base. According to Ms. Sparks, the reason that Theron stopped touching her and making sexual comments to her at work in September 2015 was because rumors had begun to spread about a sexual relationship between Theron and Ms. Sparks—specifically, that a maintenance man had caught them having sex at work, which Ms. Sparks maintains is not true—and Theron "stopped [touching and harassing her] because he knew his actions were getting out and he didn't want to have any questions on the subject." [Filing No. 48-1 at 101.] Ms. Sparks stated that other false rumors were also circulating at the time, including that Mr. Wager caught Ms. Sparks and

Theron engaging in sexual activity at work and that Ms. Sparks was engaging in sexual activity with Mr. Wager at work.  [Filing No. 48-1 at 122; Filing No. 48-1 at 127.]  Ms. Sparks stated that she was constantly being asked about the rumors and that the questioning disrupted the workplace, but her job performance did not suffer.  [Filing No. 48-1 at 141-43.]  Ms. Sparks testified that when she learned of these false rumors, she brought them to the attention of Mr. Wager.  [Filing No. 48-1 at 130.]

Mr. Wager, however, explains in a memorandum he prepared in connection with his investigation into the rumors that he overheard two CAAA employees discussing a rumor that Ms. Sparks and Theron were caught engaged in a sexual act during duty hours in a CAAA building known as "the mansion."  [Filing No. 48-9 at 1.]  Mr. Wager investigated the rumors by speaking to and obtaining written statements from the employees and maintenance personnel who were present at the mansion on the date in question.  [See Filing No. 48-9 at 1-10.]  All of those employees, including Ms. Sparks and Theron, denied that anything inappropriate or out of the ordinary had occurred.  [Filing No. 48-9 at 1-10.]  In relevant part, Mr. Wager wrote as follows regarding a conversation he had with Ms. Sparks in October 2015:

> [Ms. Sparks] wanted me to make the rumors stop and do something about it.  I informed her that I had no power to make a rumor stop.  That I was looking into it and that was all I could tell her.  I did ask her if anything had happened between her and [Theron], she told me nothing has ever happened.  That they are friends and that is all.

[Filing No. 48-9 at 2-3.]  Mr. Wager, who was also present at the mansion that day, concluded that the rumor was false and could find "no proof" regarding who was responsible for spreading the false rumor.  [Filing No. 48-9 at 4.]  He wrote: "Unless concrete evidence in the future proves that something did happen between [Theron] and Ms. Sparks, I feel at this time that [the] matter should be closed."  [Filing No. 48-9 at 4.]

During the course of his investigation, Mr. Wager asked Ms. Sparks to prepare a written statement concerning the rumors.  [Filing No. 48-1 at 131-32.]  In her statement, Ms. Sparks explained that she was approached by several people who told her about various rumors that were being spread about her interactions with Theron.  [*See* Filing No. 48-10.]  She stated that she believed that the rumors were started by Jesse Howell.  [Filing No. 48-10 at 2-3; *see also* Filing No. 48-1 at 159.]  Ms. Sparks asserted that "[t]he lying [Mr. Howell] is doing is causing me to be sexually and verbally harassed no matter where I go" and that the "whole process is starting to affect my health" and causing pancreatitis due to stress.  [Filing No. 48-10 at 2.]  In her written statement, Ms. Sparks did not include her allegation that Theron had sexually assaulted her or forcibly had intercourse with her at CAAA.  [Filing No. 48-1 at 134; *see also* Filing No. 48-9 at 8-10; Filing No. 48-10 at 1-3.]

Ms. Sparks alleges that other rumors were spread about her at work unrelated to her relationship with Theron, including that she brought anal beads to work, "something to do with an Italian porn star," and "something about f**king someone in the a**."  [Filing No. 48-1 at 165.]  She learned of these rumors at a meeting in February 2016.  [Filing No. 48-1 at 165-66.]

In addition, in March of 2017, after she was no longer employed by the Army, Ms. Sparks learned that Matthew Wright ("Matt")—who is Theron's son and also worked as an Explosives Handler at CAAA—had allegedly spread a rumor about her in October of 2015.  [Filing No. 48-1 at 161-64.]  The rumor was that Ms. Sparks had engaged in oral sex with Matt at work, during which he had "damaged [her] throat because of his size."  [Filing No. 48-1 at 160-61.]  Ms. Sparks maintains that she never engaged in any sexual activity with Matt.  [Filing No. 48-1 at 163.]  In October 2015 when he allegedly spread this rumor, Matt was a Wage Grade 5 Explosives Handler and therefore was a co-worker of equal rank to Ms. Sparks.  [Filing No.

10

48-1 at 164.]  Ms. Sparks considered herself "[Matt's] work mom at work" and socialized with him outside of work, including one occasion when she was "trying to fix him up with girls that were [her] son's age."  [Filing No. 48-1 at 164.]

### E.  Ms. Sparks' Communications with the Wright Family and Entry into Building 151

On February 27, 2016, Theron's wife, Deb Wright ("Deb"), received text messages from an anonymous source stating that Theron was having an affair with a co-worker named Eve. [Filing No. 48-15.]  Ms. Sparks denies sending these messages.  [Filing No. 48-1 172-73.] However, on March 2, 2016, Ms. Sparks sent several text messages of her own to Deb, informing her of the details of the affair.  [*See* Filing No. 48-16.]  In those messages, Ms. Sparks states that she and Theron "have been having a relationship and a sexual relationship since the middle of July last year outside of work."  [Filing No. 48-16 at 2.]  Ms. Sparks explains that "the rumors at work about [her and Theron] being caught having sex at work aren't true" and that she and Matt are both being harassed at work due to the rumors.  [Filing No. 48-16 at 3-4.]

Also on March 2, 2016, Ms. Sparks sent a text message to Matt alerting him that she had told Deb about the affair.  [Filing No. 48-17.]  A few days later, after her shift ended on March 8, 2016, Ms. Sparks visited Matt during his shift to discuss the matter.  [Filing No. 48-1 at 188-91.] At the time, Matt was working in Building 151 on the Base.  [Filing No. 48-1 at 188.]  In an email dated March 8, 2016, Carmen Dyer, Matt's supervisor, stated as follows:

> Tonight it has been brought to my attention that Eve Sparks entered Building 151 @ approximately 1715-1720 without proper [personal protective equipment], on her off hours and approached Matthew Wright[,] an operator on the line, she said something to him which in turn upset him that he came to me with it.  She should never have entered this building without going through me in the first place let alone upset one of the operators on this job.

[Filing No. 48-19 at 1.] The email was sent to several individuals, including Ms. Sparks' second level supervisor, Mr. Daters. [Filing No. 48-19 at 1.] In a subsequent email to Mr. Daters, Ms. Dyer stated that Matt was so upset by his interaction with Ms. Sparks that he "was shaking and teared up" and "looked like he could break down." [Filing No. 48-20 at 1.] Ms. Dyer decided to "pass this up the chain of command because no one should enter without coming through the supervisor and signing the visitor log." [Filing No. 48-20 at 1.]

In an email dated March 10, 2016, Matt provided his account of Ms. Sparks' visit to Building 151 and described it as Ms. Sparks "harassing" him and "making a scene." [Filing No. 48-21 at 1-2.] Later, Matt prepared a "Sworn Statement" concerning the incident. [Filing No. 42-3 at 15.] In that document, he asserted that when Ms. Sparks entered Building 151, she "was wearing safety shoes and glasses, but was not wearing any gloves or coveralls" and was wearing "nylon/spandex clothing, which was not authorized in the explosive operation due to its static generating properties." [Filing No. 42-3 at 15; see also Filing No. 42-3 at 18 (sworn statement from Brian Stevens, stating that Ms. Sparks was wearing "civilian clothing" including what appeared to be spandex pants, without coveralls or ear protection).] Matt also stated that Ms. Sparks had been sending him unwanted text messages, including an explicit photograph of herself, and that when she entered Building 151, she repeatedly tried to touch him as he was "handling components and live explosives." [Filing No. 42-3 at 15.] Matt was so upset that he did not feel safe continuing to work, given the hazardous nature of his job. [Filing No. 42-3 at 15.] He stated that after Ms. Sparks visited him at Building 151, she continued to harass him and make comments about the situation to his family members, and he did not feel safe working with her. [Filing No. 42-3 at 15.]

12

On March 10, 2016, Ms. Sparks received a notice explaining that she was not permitted to enter Building 151 without authorization.  [Filing No. 48-1 at 191-92; Filing No. 48-22 at 1.]  The notice stated:

> This is to inform you that it is unacceptable and against CAAA policies for employees to enter any explosive operating facility or facility not operating when not assigned to that area or on official business during working hours or after working hours without Approval from the chain of command and following proper procedures by first reporting to the building supervisor.  This is a serious violation to the security and force protection regulations and puts the CAAA missions at risk and will not be tolerated.

[Filing No. 48-22 at 1; *see also* Filing No. 41-3 at 3.]

Ms. Sparks testified that she put on protective eyewear and conductive boots before entering Building 151, but she did not retest the boots with a voltameter before entering, because she had checked them at a different location earlier in the day.  [Filing No. 48-1 at 278-80.]  Ms. Sparks further testified that she did not have any contact with either Theron or Matt after April 1, 2016.  [Filing No. 48-1 at 219-20.]

### F.  Ms. Sparks First Reports Theron's Alleged Harassment and the Rumors

Ms. Sparks did not report the alleged harassment by Theron to anyone in the Army in 2015, when it allegedly occurred.  [Filing No. 48-1 at 89.]  And indeed, when asked about rumors of their relationship, she denied it.  [Filing No. 48-9 at 2-3.]  The first time she reported her allegations to anyone in the Army was on March 15, 2016, when she discussed the matter with Shannon Reinhart, a union steward, who helped Ms. Sparks file an EEO complaint.  [Filing No. 48-1 at 94-96.]

On March 28, 2016, Ms. Sparks submitted a written statement to Mark Mason, a Sexual Harassment Assault Response Prevention ("SHARP") representative, concerning the alleged sexual assault by Theron.  [Filing No. 48-1 at 91; Filing No. 48-1 at 97.]  This statement

recounted Ms. Sparks' allegations that Theron had made inappropriate comments, groped her, forced her to perform oral sex, and sexually assaulted her.  [Filing No. 48-8 at 1.]  It also described the consensual affair, the rumors, and disclosing the affair to Deb.  [Filing No. 48-8 at 1-2.]

Ms. Sparks' allegations of sexual misconduct against Theron were investigated by the Army's Criminal Investigation Division ("CID"), which produced a report in August 2016.  [*See* Filing No. 42-1 at 17-18; Filing No. 51 at 6 (Ms. Sparks stating in her briefing that "the CID report came back" in August of 2016).]  The CID Report stated that the investigation did not identify any witnesses to, or prior disclosure of, non-consensual sexual activity between Ms. Sparks and Theron.  [Filing No. 41-9 at 4.]  The CID Report further stated that the United States Attorney's Office in Indianapolis had reviewed Ms. Sparks' allegations and declined to prosecute, stating that "the case lacked physical evidence and no resolution could be obtained through a criminal trial" and that "probable cause did not exist to believe [Theron] committed the offense of Abusive Sexual Contact."  [Filing No. 41-9 at 4.]  When he was interviewed in connection with the CID investigation, Theron denied Ms. Sparks' allegations of sexual assault and misconduct, stating: "I had an affair with Eve Sparks outside of the work place for six months and when I broke it off she made this complaint on me nothing ever happened at work to my knowledge she is making these claims trying to get my job . . . ."  [Filing No. 41-9 at 4-5.]

## G.  Theron's Alleged Safety Violation

Greg Bird, a Munitions Destroyer at CAAA, testified that Theron committed a safety violation sometime in the summer of 2016 while "burning in the pans."  [*See* Filing No. 42-15 at 7-8.]  Protocol requires that after an employee burns ammunition in a particular pan, the employee must wait at least two hours before using that pan again to ensure that the pan has

14

cooled and there is no residual heat that will "set off" ammunition being placed in the pan. [Filing No. 42-15 at 8; Filing No. 42-18 at 9.]  However, Theron placed ammunition in a pan that had not cooled for at least two hours.  [Filing No. 42-15 at 8.]  Mr. Bird did not report this incident, but he knows that some other, unidentified person did.  [Filing No. 42-15 at 9.]

Mr. Wager testified that he never investigated this incident because the employees "couldn't remember if it happened or not" and "[i]t was all hearsay."  [Filing No. 42-18 at 8.] Instead of investigating the violation or disciplining anyone, Mr. Wager "notified his chain of command," and they decided to change the standard operating procedure to require employees to place traffic cones near rows of pans to identify them as having just been burned, so that the same thing would not happen again.  [Filing No. 48-12 at 8-10.]

### H. Ms. Sparks Applies for an Open Munitions Destroyer Position

In May of 2016, Ms. Sparks applied for a Munitions Destroyer position.  [Filing No. 48-1 at 220.]  There were five vacancies to be filled.  [Filing No. 48-23 at 6.]  Two applicants, Santiago Lampon and Stephen (Tony) Luongo, were selected based on veterans' preference because they are both veterans.  [Filing No. 48-25 at 4.]  Ms. Sparks is not a veteran.  [Filing No. 48-1 at 222.]  Two additional applicants, Gregory Bird and Theron, were selected because they—unlike Ms. Sparks—were already employed as Munitions Destroyers on term appointments.  [Filing No. 48-25 at 3.]

Five candidates were interviewed for the fifth vacancy in June 2016, including Ms. Sparks.  [Filing No. 48-1 at 223; Filing No. 48-23 at 6-7.]  CAAA's policy for screening, interviewing, and selecting civilian employees ("the Hiring Policy") provides that the "selecting official" will develop resume review criteria and interview questions, which will be reviewed by the human resources department.  [Filing No. 48-27 at 8.]  "Selecting official" is defined as

15

"[t]he Division Manager/Program Manager/Office Chief over the position being filled." [Filing No. 48-27 at 7.] The resumes will then be evaluated by a screening panel, which is made up of three members, including "the selecting official (or another supervisor from within the organization being filled)." [Filing No. 48-27 at 7.] "The selecting official, or supervisor, will serve as the panel chair. [Filing No. 48-27 at 7.] Each member of the screening panel rates each candidate's resume separately and independently, and the five candidates with the best scores move on to the interview phase. [Filing No. 48-27 at 8.]

The Hiring Policy expressly provides that hiring is to be based on candidates' interview performances. [Filing No. 48-27 at 5 ("The concept being applied under this policy is 'the resume gets the candidate an interview, and the interview gets the candidate the job[.]'"); *see also* Filing No. 48-27 at 8 (providing that after the top five candidates have been selected for interviews based on their resume scores, "resume review scores are no longer considered in the screening process" and "[e]ach candidate being interviewed starts at zero").] During the interview phase, each panel member scores each candidate separately and independently based on their performance during the interview. [Filing No. 48-27 at 9.] The scores are recorded and totaled, and the screening panel makes a recommendation to the selecting official as to who should be hired. [Filing No. 48-27 at 9.] "Normally, the selecting official will select the candidate with the highest interview score," unless other procedures are followed for selecting a different candidate. [Filing No. 48-27 at 9.]

Ms. Sparks turned 50 years old on the day of her interview for the Munitions Destroyer position. [Filing No. 48-1 at 234.] The interview panel was made up of Sean Pinckney, Terry Carpenter, and Michele Smith. [Filing No. 48-1 at 223.] Mr. Pickney, as the "supervisor of munitions destroyers," was the panel chair. [Filing No. 48-23 at 11.] Mr. Daters was the

16

selecting official.  [Filing No. 48-23 at 11.]  Mr. Pickney "was provided the original packet [or selection criteria] that had always been used to fill munitions destroyer positions in the past" and he "updated/tweaked it to get a better cross-section of candidates to pull from and to make it more relevant to the position today."  [Filing No. 48-23 at 13.]  He explained that "questions were not tweaked because of specific people," but were "updated with more of a focus on the actual job" because "the existing criteria was outdated."  [Filing No. 48-23 at 13.]  Ms. Sparks was ranked fourth out of five candidates based on interview scores.  [Filing No. 48-25 at 2.]  The interviewee who ranked first, Phillip Kitts, was selected for the Munitions Destroyer position. [Filing No. 48-25 at 1-2.]

### I. Ms. Sparks' Complaint Relating to the Munitions Destroyer Position

Ms. Sparks made a formal complaint to the Army asserting that she was not selected for the Munitions Destroyer position due to gender and age discrimination as well as retaliation for filing harassment complaints.  [Filing No. 48-1 at 227-28.]  Specifically, Ms. Sparks believed that Mr. Daters was retaliating against her for naming him in her various complaints.  [Filing No. 48-1 at 228-29.]  According to Ms. Sparks, she heard from another person that Mr. Daters had once called Ms. Sparks a liar.  [Filing No. 48-1 at 229.]  Ms. Sparks also believes that Mr. Daters and Mr. Pinckney nefariously worked together prior to the interviews to "tweak" the questions that would be asked, and to provide certain candidates with the interview questions in advance and "coach" them regarding what to say.  [Filing No. 48-1 at 235-38.]  Ms. Sparks believes that Mr. Pinckney had trained some of the candidates on safety and other issues relating to being a Munitions Destroyer prior to their interviews, but Ms. Sparks was not given the same training opportunities and therefore was at a disadvantage when answering questions during her interview.  [Filing No. 48-1 at 238-40.]

17

The Army appointed Sara Schiach to conduct an informal investigation into Ms. Sparks' complaints relating to her non-selection for the Munitions Destroyer position.  [Filing No. 48-23 at 9.]  Among other things, Ms. Schiach independently reviewed each of the candidates' resumes and evaluated them using the same resume rating criteria as the panel members.  [Filing No. 48-23 at 6.]  She found that she and each panel member had all "scored the same individual the highest across the board" and had all ranked Ms. Sparks sixth out of eight.  [Filing No. 48-23 at 6.]  Ms. Schiach further found that all of the panel members and the selecting official (Mr. Daters) followed all proper hiring procedures and did not commit any misconduct during the hiring process.  [Filing No. 48-23 at 6-8.]  She found "no supporting evidence that knowledge of [Ms. Sparks'] assault case had any influence in the hiring process at all" and that "Ms. Sparks did not provide factual supporting evidence that she was better qualified than the candidates selected."  [Filing No. 48-23 at 7.]

**J.   The Army's Administrative Investigation into Ms. Sparks' Complaints**

In response to Ms. Sparks' various complaints, and following the CID investigation, Paul Allswede was directed in July or August of 2016 to conduct an administrative investigation into the allegations made by (and also some allegations made against) Ms. Sparks.  [Filing No. 42-1 at 17.]  That investigation culminated in an Administrative Investigation Report ("AIR").  [Filing No. 41-9 at 2-33.]  On November 21, 2016, Ms. Sparks completed a "Sworn Statement" in connection with the administrative investigation, which outlined her complaints and allegations concerning, among other things: (1) rumors that were circulated around CAAA regarding Ms. Sparks; (2) Ms. Sparks' consensual affair with Theron; (3) Ms. Sparks' visit to Building 151; and (4) Ms. Sparks' March 2016 complaint, which alleged that Theron had sexually assaulted her

numerous times on the Base and that Theron had also sexually assaulted Mr. Luongo.  [Filing No. 41-5 at 3.]

The AIR, which is dated December 8, 2016, is approximately 30 pages long and outlines all of the allegations and evidence related to Ms. Sparks' "allegations of sexual assault, harassment, retaliation, and employee misconduct," as well as her "intrusion into Production Building 151, harassment[] claims made against Ms. Sparks[,] and supplemental discoveries." [Filing No. 41-9 at 2.]  In relevant part, Mr. Allswede found as follows:

- Ms. Sparks' allegations that Theron made derogatory comments, and her "[s]exual assault allegations of groping, fellatio, and sexual intercourse" against Theron, were "[u]nsubstantiated" because Ms. Sparks "did not provide[] factual supporting evidence to prove her allegation[s]" and the employees interviewed did not corroborate her complaints.  [Filing No. 41-9 at 2-5.]  Her allegations that Theron sexually assaulted Mr. Luongo were also "[u]nsubstantiated," as Mr. Luongo and others denied that any such incident occurred.  [Filing No. 41-9 at 29-31.]

- Ms. Sparks' allegations that another employee, Jesse Howell, started rumors about her, as well as her allegations that Mr. Daters did not properly investigate her complaints about rumors, were "[u]nsubstantiated."  [Filing No. 41-9 at 9.]

- Ms. Sparks' allegations of verbal harassment by other employees concerning the rumors were "[u]nsubstantiated," and her account of the alleged harassment was "inconsistent" with the statements provided by other employees.  [Filing No. 41-9 at 12.]

- Ms. Sparks' allegations that she was retaliated against based on her age, sex, or previous complaints when she was not selected for the Munitions Destroyer position, and that the employees who were selected were not qualified, were "[u]nsubstantiated."  [Filing No. 41-9 at 12-13.]

The AIR also contained a description of Ms. Sparks' entry into Building 151 to visit Matt, as well as the disciplinary violations of which Ms. Sparks was accused in connection with that incident.  [Filing No. 41-9 at 14-21.]  Regarding those violations, Mr. Allswede found as follows:

Intrusion into B151 Endangering Operators in the Building.  Substantiated.  By her own admission Ms. E. Sparks admits to entering Production Building 151 to

19

which she was not assigned nor familiar with the active explosive operation being
executed.  Ms. E. Sparks entered the building without proper permission from the
building supervisor, while wearing improper [personal protective equipment],
failed to sign the visitor's log, and failed to check her shoes for proper grounding.
The workload being executed at the time of her entry was an active and heavily
grounded open high explosive operation.  The production building at the time of
her entry was housing 38,236.8 pounds (19.1 tons) of HBX high explosive.  Her
actions endangered a crew of fifteen (15) Crane Army employees.

[Filing No. 41-9 at 19-20.]  Mr. Allswede also found that Ms. Sparks had: (1) "[c]reat[ed] a

disturbance resulting in adverse effect on morale" by harassing and "creat[ing] a hostile work

environment towards [Matt]"; (2) issued threats against Matt; (3) knowingly made a false

statement against a co-worker; (4) "[f]ail[ed] to observe written regulations, orders, rules, or

procedures where safety to person is endangered."  [Filing No. 41-9 at 20-21.]

In addition, Mr. Allswede concluded that the allegations of harassment of co-workers by

Ms. Sparks—namely, her display of an object she represented as anal beads, her "vulgar

comments" toward an employee to the effect of "if you don't hurry up I'm going to butt f**k

you," and her harassment of Mr. Luongo by calling him an "Italian porn star"—were deemed

either "probable" or "substantiated."  [Filing No. 41-9 at 23-26.]  Mr. Allswede also concluded

that allegations made by Theron and Mr. Luongo that "munitions were being forcefully

mishandled (e.g. throwing, slamming down)" by Ms. Sparks were "[s]ustained."  [Filing No. 41-
9 at 32-33.]

### K.  Ms. Sparks is Not Selected for HAZWOPER Training

Hazardous Waste Operations and Emergency Response ("HAZWOPER") training is a

process through which CAAA employees are certified to handle certain hazardous materials.

[Filing No. 48-1 at 32; Filing No. 48-2 at 2.]  Employees who work in certain areas on the Base

are required to have HAZWOPER training, but it is not required for every employee.  [Filing No.

48-1 at 32; Filing No. 48-13 at 322.]  Ms. Sparks attended HAZWOPER training in 2015 and

became certified.  [Filing No. 48-1 at 34-35.]  However, it is not mandatory for people in Ms.

Sparks' position as an Explosives Handler to receive HAZWOPER training.  [Filing No. 48-13 at

375; Filing No. 48-31 at 4.]

Ms. Sparks found out in January 2017 that she was not selected to attend the

HAZWOPER training that took place in December 2016.  [Filing No. 48-1 at 252-53.]  At least

75 other employees also did not receive HAZWOPER training at that time.  [Filing No. 48-31 at

7-9.]  At least 14 of those employees were male Explosives Handlers under the age of 40.

[Filing No. 48-32 at 2-3.]  Ms. Sparks believes that Mr. Daters is the person who decides which

employees receive HAZWOPER training and which do not.  [Filing No. 48-1 at 253-55.]

### L.  Ms. Sparks' Employment is Terminated

In January of 2017, Ms. Sparks learned that her term of employment as an Explosives

Handler was not going to be renewed.  [Filing No. 41-3 at 2; Filing No. 48-1 at 263-65.]  She

was placed on administrative leave from January 19, 2017 until the end of her term on February

10, 2017.  [Filing No. 48-1 at 265.]  According to Mr. Allswede, the decisions not to renew her

term and to place her on administrative leave were the result of "[s]afety concerns" stemming

from Ms. Sparks' entry into Building 151 and a separate incident of "violently handling"

explosives.  [Filing No. 42-1 at 56-57.]

### M. This Lawsuit

Ms. Sparks filed the initial Complaint in this action in November 2020, along with a

Motion for Leave to Proceed *In Forma Pauperis* ("IFP").  [Filing No. 1; Filing No. 2.]  The

Court granted the Motion for Leave to Proceed IFP, screened her initial Complaint pursuant to

28 U.S.C. § 1915, and dismissed the initial Complaint.  [Filing No. 4.]  Thereafter, Ms. Sparks

filed an Amended Complaint.  [Filing No. 6.]  The Court screened the Amended Complaint and

determined that the following claims could proceed: (1) hostile work environment based on sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq; (2) retaliation under Title VII relating to her termination; (3) sex discrimination under Title VII relating to the denial of HAZWOPER training and failure to hire for the Munitions Destroyer position; and (4) age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, relating to the denial of HAZWOPER training and failure to hire for the Munitions Destroyer position.[1] [Filing No. 7 at 10.]

On January 3, 2022, Ms. Sparks filed her Motion for Summary Judgment with Compensation. [Filing No. 41.] Ms. Wormuth then filed her Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Cross-Motion/Response"). [Filing No. 48; Filing No. 49.] Ms. Sparks then filed her Response to Defendant's Motion for Summary Judgment ("Response"). [Filing No. 51.] Ms. Wormuth then filed her Reply in Support of Defendant's Cross-Motion for Summary Judgment ("Reply"). [Filing No. 52.] Accordingly, both motions for summary judgment are fully briefed and ripe for the Court's decision.[2]

---

[1] The Court dismissed all other claims asserted in the Amended Complaint and gave Ms. Sparks an opportunity to identify any additional claims that she believes were alleged in the Amended Complaint but not identified by the Court in its screening order. [Filing No. 7 at 10.] Ms. Sparks never identified any additional claims. Accordingly, to the extent Ms. Sparks' summary judgment filings discuss claims other than the four claims set forth above that were permitted to proceed—or assert facts related solely to dismissed claims—those facts and arguments will not be considered.

[2] After summary judgment briefing was completed, Ms. Sparks filed a document titled "Plaintiff Medical Update," which is designated on the docket as an additional response to Ms. Wormuth's Cross-Motion for Summary Judgment. [Filing No. 57.] That document explains some medical issues that Ms. Sparks is currently facing and indicates that she "continues to patiently await the Court[']s decision on her Motion for Summary Judgment in hopes of a ruling in her favor to put an end to a nightmare she has had to deal with for almost 7 years." [Filing No. 57 at 1-2.] While the Court is sympathetic to Ms. Sparks' medical condition, these matters are inappropriate for consideration on the summary judgment motions and will therefore not be considered.

## IV.
### DISCUSSION OF SUMMARY JUDGMENT MOTIONS

**A.  The Adequacy of Ms. Sparks' Response**

At the outset, the Court notes that in her Response, instead of providing any substantive responses to the arguments raised by Ms. Wormuth in support of her Cross-Motion for Summary Judgment, Ms. Sparks asserts that "there is no need for her to provide a response to the Defendant's Motion for Summary Judgement" because "there is no possible justification that the Defendant can provide to the Court to justify the gender discrimination, the age discrimination, the harassment, the hostile work environment, the retaliation[,] and the assault she endured during her employment with the Defendant."  [Filing No. 51 at 1.]  She states that "[t]he only thing that [she] believes is missing from her Motion for Summary Judgement is a timeline of events from the start of her employment with the Defendant until the time her employment was wrongfully terminated," and she provides a list of dates and relevant events.  [Filing No. 51 at 2-9.]  This "timeline" is not accompanied by citations to the record.  [*See* Filing No. 51 at 2-9.] Nor is it sworn or attested to under penalties for perjury.

In her Reply, Ms. Wormuth argues that by failing to respond to the arguments raised in the Cross-Motion/Response, Ms. Sparks has waived "any arguments that she could have raised in opposition to Defendant's factual assertions."  [Filing No. 52 at 1.]  Accordingly, Ms. Wormuth argues, the Court may accept all of Ms. Wormuth's factual assertions as true in ruling on the summary judgment motions.  [Filing No. 52 at 2.]  Ms. Wormuth also objects to Ms. Sparks' "timeline" on the grounds that Ms. Sparks did not support any of her assertions in the timeline with citations to evidence in the record and based on Ms. Sparks' "continued reliance on inadmissible hearsay throughout this timeline."  [Filing No. 52 at 2-3.]

23

Generally, a litigant's failure to respond to the evidence or arguments presented in the opposing party's summary judgment motion results in waiver of the litigant's claims and allows the Court to accept the other party's version of the facts as true. *See, e.g.*, *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016) ("By failing to respond to the facts [presented in the Defendants' summary judgment motions], the local rules [for the Southern District of Indiana] make it clear that Defendants' facts are to be taken as they are represented in their motions. . . . Further, by failing to respond in any way to any of the arguments advanced by Defendants . . . , Plaintiffs have waived their claims."). However, given Ms. Sparks' *pro se* status, and in the interests of a thorough merits determination, the Court will address the merits of Ms. Sparks' claims. But, the Court will give no consideration to Ms. Sparks' timeline, which is unsworn and unsupported by citations to admissible evidence in the record. But as noted above, regardless of Ms. Sparks' procedural failings, the Court has evaluated the record to determine which facts are meaningfully disputed for purposes of resolving the summary judgment motions.

### B. Hostile Work Environment

Ms. Sparks asserts that she was sexually harassed by Theron during July and August of 2015. [Filing No. 41 at 3.] She maintains that Theron sexually assaulted her, and that "[j]ust because the incidents didn't have actual witnesses doesn't mean it didn't happen." [Filing No. 41 at 3-4.] Ms. Sparks further asserts that "from September 2015 through January 2017[,] she was constantly subjected to harassment from employees of the Defendant due to false rumors that were being circulated by Matthew Wright." [Filing No. 41 at 5.] She alleges that "she reported several incidents of sexual harassment" to Mr. Daters, but these reports were not investigated until August 2016. [Filing No. 41 at 6-7.]

In her Cross-Motion/Response, Ms. Wormuth argues that Ms. Sparks cannot prevail on her hostile work environment claim because she has not shown any basis for employer liability. [Filing No. 49 at 21.]  Specifically, Ms. Wormuth argues that the undisputed evidence shows that Ms. Sparks' allegations of harassment were directed at her coworkers, not at any supervisor; Ms. Sparks unreasonably failed to report the alleged harassment to the Army; and Ms. Sparks "affirmatively misled" the Army about the nature of her relationship with Theron, thereby frustrating any of the Army's efforts to investigate the situation.  [Filing No. 49 at 21-25.]  Ms. Wormuth also argues that Ms. Sparks' allegations against Matt cannot create a hostile work environment as a matter of law because she did not hear about Matt's comments until months after her employment at CAAA ended.  [Filing No. 49 at 26-27.]  Furthermore, Ms. Wormuth contends that Ms. Sparks' allegations about other rumors spread at the workplace do not amount to a hostile work environment because: (1) Ms. Sparks was indeed having an affair with Theron, and "cannot 'engage in conduct that gives rise to rumors and then use those very rumors as the basis of hostile work environment claim'"; and (2) in any event, because the rumors concerned both Ms. Sparks and Theron, Ms. Sparks cannot show that she was subjected to a hostile work environment based on her membership in a protected class.  [Filing No. 49 at 27-28 (quoting *Reiter v. Oshkosh Corp.*, 2010 WL 2925916, at *5 (E.D. Wis. July 22, 2010)).]

Ms. Sparks' does not address her hostile work environment claim in her Response.  [*See* Filing No. 51.]

In her Reply, Ms. Wormuth reiterates that she is entitled to summary judgment on Ms. Sparks' hostile work environment claims for the reasons set forth in the Cross-Motion/Response. [Filing No. 52 at 4-6.]

"'Hostile or abusive work environments are forms of sex discrimination actionable under Title VII of the Civil Rights Act of 1964.'" *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 812 (7th Cir. 2022) (quoting *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008)).  To establish a claim of hostile work environment based on sex, a plaintiff must demonstrate that: (1) she was subjected to unwelcome sexual conduct, advances, or requests; (2) the unwelcome conduct was because of her sex: (3) the conduct was "severe or pervasive enough to create a hostile work environment"; and (4) there is a basis for employer liability.  *Paschall*, 28 F.4th at 812-13 (citation omitted).

"Whether there is a basis for employer liability depends on whether the harasser is the victim's supervisor or co-employee."  *Id.* at 813 (citation omitted).  "'When a supervisor is the harasser, the employer is strictly liable for his or her conduct, subject to any affirmative defenses that may preclude its liability.'"  *Id.* (quoting *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004)).  However, when a co-worker is the harasser, the employer is liable only if the plaintiff shows that the employer "has been negligent in either discovering or remedying the harassment."  *Paschall*, 28 F.4th at 813 (internal quotations and citation omitted).  Put differently, "[a]n employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees."  *Id.* (quoting *Parkins v. Civ. Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)) (internal quotations omitted).

"To prove negligence, an employee usually must make a concerted effort to inform the employer that a problem exists," such as "lodging a complaint with human resources or telling high-level management about the harassment."  *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017) (internal quotations and citations omitted).  "[A]n employee's subjective

fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 638 (7th Cir. 2009) (ellipses original) (internal quotations and citation omitted).

Finally, "[i]n assessing the corrective action, [the] focus is not whether the perpetrators were punished by the employer, but whether the employer took reasonable steps to prevent future harm." *Id.* at 637. "Title VII requires only that the employer take steps reasonably likely to stop the harassment." *Id.* (internal quotations and citation omitted). "[The Seventh Circuit] has often said, 'a prompt investigation is the hallmark of a reasonable corrective action.'" *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 630 (7th Cir. 2019) (quoting *Porter*, 576 F.3d at 637). This can be true even if the employer's investigation does not result in disciplinary action against the alleged offender. *See Hunt*, 931 F.3d at 631 (finding no basis for employer liability where the employer "did what a reasonable employer should[,] . . . even though the investigation failed to substantiate the [plaintiff's] allegations").

As an initial matter, many of Ms. Sparks' assertions are not supported by evidence. Although she asserts that she was harassed from September 2015 to January 2017, she does not provide any evidence of confrontations or harassment regarding the alleged rumors about her other than those that occurred in 2015. Furthermore, Ms. Sparks admits that she was not aware of many of these rumors—specifically the rumors allegedly spread by Matt that he was engaging in sexual acts with Ms. Sparks—until long after they were allegedly spread and after her employment with the Army had already ended. Rumors of which Ms. Sparks was not aware cannot support a hostile work environment claim.

In any event, Ms. Sparks' hostile work environment claim fails because she has failed to show a basis for employer liability. Regarding the alleged assault and sexual harassment by

27

Theron, Ms. Sparks cannot show that the Army was negligent in failing to discover or remedy the situation because, by her own admission, not only did Ms. Sparks fail to report Theron's alleged behavior while it was occurring, but she affirmatively told her supervisor in October of 2015 that nothing inappropriate had ever occurred between her and Theron.  [*See* Filing No. 48-9 at 2-3 (Mr. Wager's memorandum stating: "I did ask her if anything had happened between her and [Theron], she told me nothing has ever happened.  That they are friends and that is all."); Filing No. 48-1 at 146-47 (Ms. Sparks admitting in her deposition that she made untrue statements to Mr. Wager regarding her relationship with Theron).]  Although Ms. Sparks maintains that she did not report Theron because she was afraid of losing her job, that fear did not relieve her of her obligation to alert the Army of the alleged harassment.  *See Nischan*, 865 F.3d at 931; *Porter*, 576 F.3d at 638.  By the time Ms. Sparks reported the alleged harassment in March of 2016, Theron had stopped the alleged harassing conduct, so there can be no assertion that the Army failed to take reasonable steps to put an end to the harassment once it learned of Ms. Sparks' allegations.  [*See* Filing No. 48-1 at 100-01 (Ms. Sparks testifying that Theron never touched her or made any harassing comments to her at work after September 2015).]

Ms. Sparks' allegations of a hostile work environment resulting from the rumors that were being spread about her fare no better.  Once Mr. Wager became aware of the rumors, he investigated the situation by speaking to those involved.  The fact that his investigation did not reveal the source of the rumors or lead to disciplinary action against any employee does not render the Army's response to Ms. Sparks' complaints unreasonable.  *See Hunt*, 931 F.3d at 630; *Porter*, 576 F.3d at 637.  And there is no evidence demonstrating that the rumors continued to be

spread or that people continued to confront Ms. Sparks about the rumors after the investigation concluded.[3]

In sum, there is no evidence from which a reasonable factfinder could conclude that there is a basis for employer liability on Ms. Sparks' hostile work environment claim. As a result, Ms. Sparks' Motion for Summary Judgment, [Filing No. 41], is **DENIED** to the extent she seeks judgment in her favor on that claim, and Ms. Wormuth's Cross-Motion for Summary Judgment, [Filing No. 48], is **GRANTED** to the extent she seeks judgment in her favor on that claim.

### C. Age and Sex Discrimination Relating to the Munitions Destroyer Position

In support of her Motion for Summary Judgment, Ms. Sparks argues that she was discriminated against based on her age and sex when she was not selected for the Munitions Destroyer position in June 2016. [Filing No. 41 at 18.] She asserts that she was the most qualified for the position, but the three people that were hired were males under the age of 41, and two of those selected did not even interview for the position. [Filing No. 41 at 18-19.] She points out that CAAA has only had two female Munitions Destroyers since 2010. [Filing No. 41 at 19.] Ms. Sparks further argues that the employees selected for the position were all "coached" by the supervisor, Mr. Pickney, who was also a member of the interview panel despite the fact that CAAA's procedures prohibit supervisors from sitting on interview panels. [Filing No. 41 at

---

[3] In addition, Ms. Sparks' allegations principally involve rumors that she and Theron (and potentially also Mr. Wager) were involved in a sexual relationship or engaged in sexual conduct at work. Because these rumors involved Ms. Sparks as well as male employees, she cannot demonstrate that these rumors were spread because of her sex, and therefore cannot sustain a hostile work environment claim based on sexual harassment in connection with these rumors. *See Pasqua v. Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) (rejecting a Title VII sexual harassment claim based on other employees spreading rumors that a male and female employee were engaged in an intimate relationship, and acknowledging that "[b]y the very nature of such gossip, *both* [the male and female employee] were made the subject matter" and "[s]uch rumors spread, irrespective of the truth, for any number of reasons having nothing to do with gender discrimination") (emphasis original).

19-23.]  She also alleges that Mr. Pickney improperly "updated/tweaked" the selection criteria for the position.  [Filing No. 41 at 23.]

In her Cross-Motion/Response, Ms. Wormuth argues that Ms. Sparks was not discriminated against when she was not selected for the Munitions Destroyer position.  [Filing No. 49 at 28.]  Specifically, Ms. Wormuth asserts that current CAAA policy provides that Mr. Pickney, as the supervisor of the open position, should sit on the panel and that veterans may be given preference over other applicants.  [Filing No. 49 at 29-30.]  Ms. Wormuth contends that Ms. Sparks' allegations that some employees were improperly coached is not supported by evidence.  [Filing No. 49 at 30-31.]  Ms. Wormuth also argues that Ms. Sparks is "trumpeting her qualifications for the position," but the position was filled based on the candidates' interview performance, as required by policy, and Ms. Sparks did not perform as well during the interview as other candidates did.  [Filing No. 49 at 28.]

In her Response, Ms. Sparks does not substantively respond to Ms. Wormuth's arguments concerning age or sex discrimination.  [*See* Filing No. 51.]

In her Reply, Ms. Wormuth maintains that Ms. Sparks was not discriminated against, and she was not selected for the Munitions Destroyer position because she did not do as well as other applicants during the interview.  [Filing No. 52 at 6.]

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the ADEA protects workers over 40 years old from age-based discrimination, *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019), and provides that it is unlawful for an

employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age," 29 U.S.C. § 623(a)(1). Both Title VII and the ADEA "share similar analytical approaches" at summary judgment, except that the ADEA is "narrower" than Title VII because "[a]lthough Title VII turns on a broader 'motivating factor' theory of liability, the relevant standard under the ADEA is whether age was the 'but for' cause of the allegedly discriminatory employment action." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021).

One way that a plaintiff may prove employment discrimination under Title VII or the ADEA is to utilize the burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Igasaki*, 988 F.3d at 957, 960. "The familiar *McDonnell Douglas* approach requires a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601-02 (7th Cir. 2020), *reh'g denied* (July 31, 2020). "To make a prima facie case under *McDonell Douglas*, a plaintiff must show: (1) [she] belongs to a protected class; (2) [she] met [her] employer's legitimate expectations; (3) [she] suffered an adverse employment action; and (4) another similarly situated employee outside of [her] protected class received better treatment from [her] employer." *Igasaki*, 988 F.3d at 957.

However, a plaintiff need not rely on the *McDonnell Douglass* framework, and at summary judgment, "the 'singular question' for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse

employment action.'" *Purtue*, 963 F.3d at 602 (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)).  In order to make out a case of discrimination without utilizing the *McDonnell Douglass* framework, "'a plaintiff must provide either direct or circumstantial evidence that supports an inference of intentional discrimination.'" *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (quoting *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009)).  The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929.

Ms. Sparks' discrimination claims relating to her non-selection for the Munitions Destroyer position fail for lack of evidence.  As an initial matter, she misstates many of the facts concerning the interview process.  Of the five individuals that were hired for open Munitions Destroyer positions, four were hired without interviews: two based on veterans' preference, and two as a result of their current employment as Munitions Destroyers on a term basis.  [*See* Filing No. 48-25 at 3-4.]  Ms. Sparks does not claim to be similarly situated to any of these four individuals, as she is undisputedly not a veteran and was not working as a Munitions Destroyer on a term basis.  She also does not provide any evidence or argument suggesting that these individuals were not in fact veterans or current Munitions Destroyers, and therefore there is nothing in the record from which a reasonable factfinder could infer that they were hired over Ms. Sparks because they are men under 40 years old.

As for the fifth open Munitions Destroyer position, Ms. Sparks was one of several candidates interviewed, and she scored the second worst.  Her suggestion that it was against

CAAA policy for Mr. Daters to serve as the selecting official or for Mr. Pickney to participate on the panel is flatly contradicted by the Hiring Policy, which expressly provides that the selecting official should be "[t]he Division Manager/Program Manager/Office Chief over the position being filled," and that the panel chair can be "the selecting official (or another supervisor from within the organization being filled)." [Filing No. 48-27 at 7.] Her argument that Mr. Pickney improperly "tweaked" the selection criteria or "coached" certain candidates to give them an unfair advantage is supported by nothing other than inadmissible hearsay[4] and Ms. Sparks' own speculation. She also provides no evidence suggesting that the individuals hired were not qualified for the position. Although Ms. Sparks points out that there have only been two female Munitions Destroyers since 2010, that alone is insufficient to support a reasonable inference that she was not hired because of her sex or age.

Accordingly, Ms. Sparks has failed to produce evidence from which a reasonable factfinder could conclude that her non-selection for the Munitions Destroyer position was motivated by her age or sex. Her Motion for Summary Judgment, [Filing No. 41], is **DENIED** to the extent that she seeks judgment in her favor on her age and sex discrimination claims relating to the Munitions Destroyer position. Ms. Wormuth's Cross-Motion for Summary Judgment, [Filing No. 48], is **GRANTED** to the extent that she seeks judgment in her favor on that claim.

---

[4] Ms. Sparks points to a Facebook message from another employee, Jordan Prince, stating that he saw other candidates being given materials to study in preparation for the Munitions Destroyer interview, as well as administrative hearing testimony by another employee, Month Canfield, who stated that he overheard someone tell others that certain candidates had been coached. [*See* Filing No. 41 at 22-23.] This evidence constitutes hearsay, and "a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

### D.  Age and Sex Discrimination Relating to HAZWOPER Training

In support of her Motion for Summary Judgment, Ms. Sparks contends that she was discriminated against based on her age and sex when she was denied HAZWOPER training. [Filing No. 41 at 21.]  She asserts that the training was not required for her job as an Explosives Handler, but was required for the Munitions Destroyer position that she was applying for. [Filing No. 41 at 21-22.]

In her Cross-Motion/Response, Ms. Wormuth argues that Ms. Sparks was not denied HAZWOPER training because of her sex or age, that such training was not required for her job as an Explosives Handler, and that the record shows that several female employees attended the training while "at least fourteen male Explosives Handlers under the age of 40" were not selected to attend the training.  [Filing No. 49 at 32-33.]

Ms. Sparks does not specifically address this claim in her Response.  [*See* Filing No. 51.]

In her Reply, Ms. Wormuth reiterates her arguments that Ms. Sparks was not discriminated against with respect to the HAZWOPER training.  [Filing No. 52 at 7-8.]

Ms. Sparks' discrimination claims relating to the denial of HAZWOPER training also fail for lack of evidence.  Although Ms. Sparks seems to suggest that she was denied HAZWOPER training so that the Army could then use her lack of training as a pretext for failing to hire her for the Munitions Destroyer position, that suggestion is belied by the fact that the HAZWOPER training that Ms. Sparks alleges she was denied took place in December of 2016, long after she had been rejected for the Munitions Destroyer position in June 2016.  In any event, she points to no evidence that the denial of training was based on a discriminatory motive, and the record shows that several employees who were males under the age of 40 also did not receive the training.  [*See* Filing No. 48-31 at 7-9; Filing No. 48-32 at 2-3.]

In sum, the record contains no evidence from which a reasonable factfinder could conclude that Ms. Sparks was discriminated against based on her sex or age when she was denied HAZWOPER training.  Her Motion for Summary Judgment, [Filing No. 41], is **DENIED** to the extent that she seeks judgment in her favor on that claim.  Ms. Wormuth's Cross-Motion for Summary Judgment, [Filing No. 48], is **GRANTED** to the extent that she seeks judgment in her favor on that claim.

### E.  Retaliation

In support of her Motion for Summary Judgment, Ms. Sparks asserts that the AIR prepared by Mr. Allswede contains "knowingly false statements" concerning her allegations of sexual assault and harassment that were intended to "make Ms. Sparks look in a bad light," and the Army should have hired an independent investigator to look into her allegations.  [Filing No. 41 at 8-10.]  She argues that the administrative investigation did not "go up the Chain of Command" because Mr. Allswede conducted the investigation, prepared the AIR, and then was promoted and as a result reviewed and approved the AIR.  [Filing No. 41 at 13-14.]  She further contends that she was wrongfully terminated based on the false statements in the AIR, and that she did not break the rules by entering Building 151 because she was wearing the proper protective equipment when she entered.  [Filing No. 41 at 10-12.]  According to Ms. Sparks, while the Army claims that she was terminated for safety violations, Theron also committed a serious safety violation and was not terminated.  [Filing No. 41 at 12-13.]  Ms. Sparks asserts that Mr. Daters, who was a supervisor, advised Theron and Matt to file restraining orders against Ms. Sparks; that the EEO Director committed witness tampering by advising a witness "on how to answer the questions of the investigator"; that she was falsely accused of bringing anal beads

to work and saying that she was "going to f**k somebody in the a**";[5] and that a manager, Anthony Edwards, "made inappropriate comments to [her] and overstepped his boundaries." [Filing No. 41 at 14-17.]

In her Cross-Motion/Response, Ms. Wormuth argues that the Army's decision not to renew Ms. Sparks' term employment was not retaliatory. [Filing No. 49 at 33.] Instead, Ms. Wormuth asserts, Ms. Sparks' term was not renewed because Ms. Sparks entered Building 151 outside of her work hours, without permission from a supervisor, "and with a total disregard for the dangerous explosives work that was going on in the building at the time—all because she wanted to confront Matt Wright about an affair she had been having with his father." [Filing No. 49 at 34.]  Ms. Wormuth argues that regardless of whether Ms. Sparks was wearing proper protective equipment at the time, she still violated the rules by failing to first report to a building supervisor upon entering the building. [Filing No. 49 at 34-35.]  Finally, Ms. Wormuth contends that Ms. Sparks' other grievances beyond her termination—including false accusations and witness tampering—are outside the scope of her retaliation claim, which the Court previously limited in screening the Amended Complaint. [Filing No. 49 at 35.]  In any event, Ms. Wormuth asserts, none of those other grievances constitute adverse employment actions that can support a retaliation claim. [Filing No. 49 at 35.]

Ms. Sparks does not specifically address her retaliation claims in her Response. [*See* Filing No. 51.]

In her Reply, Ms. Wormuth reiterates her argument that Ms. Sparks' employment was not terminated due to retaliation, but was terminated because of Ms. Sparks' "exceptionally poor

---

[5] Ms. Sparks admits, however, that she called Mr. Luongo an "Italian pornstar," but she asserts that "it wasn't done in a derogatory manner" and that if Mr. Luongo had told her that "the comment was bothersome to him[,] she wouldn't have said it again." [Filing No. 41 at 16.]

36

judgment in entering a facility where personnel were working with live explosives, without checking with a supervisor and while she was off the clock." [Filing No. 52 at 8-9.]

Title VII "prohibit[s] employers from retaliating against their employees because an employee complained of discrimination." *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 761 (7th Cir. 2022) (citing 42 U.S.C. § 2000e-3(a)). "To survive summary judgment on a retaliation claim, a plaintiff must come forward with sufficient evidence for a reasonable jury to conclude that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) [there is] causation." *Lewis*, 36 F.4th at 761.

"As with discrimination claims, the question for a retaliation claim should always be: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Igasaki*, 988 F.3d at 959 (internal quotations and citations omitted). Title VII retaliation claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). "To show causation, employees may point to circumstantial evidence, such as 'suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual.'" *Lewis*, 36 F.4th at 761 (quoting *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)).

As an initial matter, the Court agrees with Ms. Wormuth that Ms. Sparks' retaliation claim was limited at the screening stage to her theory that her employment was terminated in retaliation for her reports of sexual harassment, in violation of Title VII. [Filing No. 7 at 6-7 (the Court's December 17, 2020 Order stating: "To the extent that Ms. Sparks alleges that she was wrongfully terminated following the investigation into her reports of sexual harassment, she has

37

also sufficiently stated a claim for retaliation under Title VII.").]  Accordingly, many of the items on Ms. Sparks' laundry list of grievances—namely, her allegations that Mr. Daters advised Matt and Theron to obtain restraining orders, that other employees made false accusations about her conduct, and that a manager made inappropriate comments to her—are irrelevant because they are outside the scope of that claim.  And, in any event, they do not constitute adverse employment actions for purposes of her retaliation claim.  *See, e.g.*, *Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (explaining that an adverse employment action "is one that is materially adverse, meaning more than a mere inconvenience or an alteration of job responsibilities" and may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation") (internal quotations and citation omitted).

Regardless, Ms. Sparks' retaliation claim fails for lack of evidence.  She does not provide any evidence to support her assertion that the AIR contains false statements, or that Mr. Allswede acted improperly by not having someone else investigate or by signing the report himself.  Even if she did provide such evidence, Ms. Sparks does not dispute that she entered Building 151 without authorization from the supervisor.  And while she asserts that she was wearing proper protective equipment at the time, even if that is true, that does not address her failure to obtain supervisory approval for her entry.  Accordingly, nothing about any of these matters raises an inference of retaliation.

Finally, although evidence that a similarly situated employee was treated differently may support an inference of retaliation, Ms. Sparks has not demonstrated that the circumstances of Theron's alleged safety violation and her admitted safety violation are similar such that the fact

that Theron was not terminated creates an inference of improper retaliatory motive in this case. *See Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (explaining that "the similarly-situated inquiry is flexible, common-sense, and factual," and "the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision"). Specifically, Ms. Sparks has produced evidence showing that Theron may have (intentionally or otherwise) violated safety procedures by placing ammunition into a hot pan while working, which created a risk of inadvertently setting off the ammunition. She has not, however, produced evidence indicating that this alleged violation is a fireable offense or is similar in severity to her own violation, which involved intentionally entering a building without authorization, for purposes unrelated to her employment, to harass an employee handling live explosives. Accordingly, this evidence alone could not support a reasonable inference of retaliation.

In sum, the record does not contain sufficient evidence to permit a reasonable factfinder to conclude that Ms. Sparks was retaliated against when her term was not renewed (or in any other way). Ms. Sparks' Motion for Summary Judgment, [Filing No. 41], is **DENIED** to the extent that she seeks judgment in her favor on this claim. Ms. Wormuth's Cross-Motion for Summary Judgment, [Filing No. 48], is **GRANTED** to the extent that she seeks summary judgment in her favor on this claim.

## IV.
### CONCLUSION

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (internal quotations and citation omitted). For the reasons described above, Ms. Sparks has failed to offer

sufficient evidence to support her claims.  No reasonable jury could decide any of them in her

favor.  As a result, her Motion for Summary Judgment, [41], is **DENIED**, and Ms. Wormuth's

Cross-Motion for Summary Judgment, [48], is **GRANTED**.  In addition, Ms. Sparks' "Motion to

Remove a Filed Document by the Defendant and Document Should be Disregarded," [54], is

**DENIED**.  Final judgment shall issue accordingly.



Date: 9/16/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana



**Distribution via U.S. Mail to:**

Eve Baker Sparks
1082 N. Holtsclaw Road
Bloomfield, IN 47424


**Distribution via ECF only to all counsel of record**